UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

JAMES A. CARR,

        Petitioner,

           v.                 CAUSE NO. 3:21-CV-514-DRL-MGG

WARDEN,

        Respondent.

OPINION AND ORDER

James A. Carr, a prisoner without a lawyer, filed a habeas corpus petition under 28 U.S.C. § 2254 to challenge his conviction for murder under Case No. 25D01-611-MR-277. Following a jury trial, on December 5, 2011, the Fulton Superior Court sentenced him to 55 years of incarceration.

In deciding this habeas petition, the court must presume the facts set forth by the state courts are correct unless they are rebutted with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The Indiana Court of Appeals summarized the evidence from the trial:

> On November 4, 2006, Carr entered the Denton Corner Tavern in Monterey, Indiana. The bartender, Jan French, was informed by a customer that Carr had blood on his pants.
>
> French spoke with Carr, and Carr said that he needed to go home. French did not believe that Carr could safely drive because he was intoxicated. French offered to drive him home and arranged to have Darlene Denton, the tavern owner, follow them in a separate vehicle.
>
> During the drive, Carr informed French that "he was going to jail." She assured him that he need not worry because she was driving. He then told her that he had shot Roy Shaffer. He said that Shaffer "wouldn't tell me the truth, so I pulled the trigger."

Carr was allowing Shaffer to stay at Carr's mother's vacant house and was providing support until Shaffer could become self-sufficient. Carr and Shaffer had spent the night drinking at Shaffer's home. According to Carr, an argument began between the two men, which resulted in the shooting.

After French delivered Carr to his home, she relayed to Denton what Carr had told her. French and Denton returned to the tavern and called the sheriff's department to report the incident. Both women drove to the house in order to provide the sheriff's department with more information. When they arrived at Shaffer's house, the women found Shaffer lying in a wheelbarrow with his legs draped over the side. French was on the phone with the sheriff's department when they discovered Shaffer's body.

Deputy Terry Engstrand of the Fulton County Sheriff's Department responded to the dispatch. Deputy Engstrand found Shaffer in the wheelbarrow, and it was apparent that he had been shot in the face and had a wound on his right cheek. Detective Daniel Pryor arrived a short time later. When Detective Pryor questioned Denton and French, the women confirmed that Carr had admitted to killing Shaffer. Officers searched Carr's house, and he was taken into custody. During the search, Carr said, "I haven't told anyone. Oh wait, I did tell someone." On November 8, 2006, Carr was charged with murder. A jury trial was conducted in April 2009, and Carr was found guilty of murder. On June 16, 2009, Carr was sentenced to fifty-five years imprisonment. Carr appealed this conviction and raised the issue of an erroneous police interview conducted in disregard of his right to counsel. In a memorandum decision, we affirmed Carr's conviction. The supreme court, however, granted Carr's petition to transfer, and on September 29, 2010, the supreme court reversed our determination and remanded the case for a new trial.

On March 1, 2011, Carr requested a change of venue and moved for a change of judge. On April 8, 2011, the trial court found that Carr's motion for change of venue was premature and denied his motion for change of judge. On September 6, 2011, Carr filed a petition for writ of mandamus in our supreme court requesting the trial court be ordered to grant his motion for change of judge. The supreme court denied Carr's petition stating that it was not timely filed and that it failed to demonstrate any bias.

A second jury trial was conducted in October 2011. At the trial, the State presented evidence from forensic pathologist Dr. Joseph Prahlow who performed the autopsy on Shaffer. Dr. Prahlow concluded that Shaffer suffered a stellate shotgun wound to the face. Shaffer's wound also showed

signs of soot on the outside of and deep within the wound. Through his study of the wound, which included an examination of the soot and the charring of the wound, he could not determine if the wound was inflicted from a distance or in contact with Shaffer's face. He did state that it was unlikely to find deep charring in a distant wound and that Shaffer's wound had signs that were more characteristic of a contact wound.

Carr's counsel presented two hypothetical scenarios to Dr. Prahlow during cross-examination. First, counsel asked whether the wound was consistent with a scenario in which a person is holding a shotgun, stumbles, reaches across a table, and discharges a gun. Dr. Prahlow agreed that this is a possible scenario in which the wound could have occurred. Second, Carr's counsel asked if the wound was consistent with a scenario in which one person is holding the shotgun and the victim shoves the person who falls to the floor and pulls the trigger as a result of the fall. Again, Dr. Prahlow agreed. Beyond the presentation of these hypothetical scenarios, Carr provided no evidence to prove the hypothetical scenarios.

At trial, Carr tendered a jury instruction on the lesser included offense of reckless homicide. Carr asserted that there was a serious evidentiary dispute as to Carr's state of mind at the time of the shooting, which was evidenced by Dr. Prahlow's positive responses to his hypothetical scenarios. The trial court denied this request, finding no serious evidentiary dispute, and instructed the jury only on the charge of murder. The jury found Carr guilty of murder, and he was sentenced to fifty-five years. He now appeals.

*Carr v. State*, 972 N.E.2d 419 (Ind. Ct. App. 2012); ECF 25-14 at 2-5.

In the petition, Mr. Carr raises numerous claims of trial court error, prosecutorial misconduct, trial counsel error, and appellate counsel error. Mr. Carr further asserts error on post-conviction review. Because there is no constitutional right to post-conviction proceedings, this claim does not present valid grounds for habeas relief. *See Flores-Ramirez v. Foster*, 811 F.3d 861, 866 (7th Cir. 2016) ("It is well established that the Constitution does not guarantee any postconviction process, much less specific rights during a postconviction hearing."). He also asserts freestanding claims of actual

innocence. Though actual innocence may be a basis to excuse procedural deficiencies, federal courts have not recognized actual innocence as an independent basis for habeas relief. *Herrera v. Collins*, 506 U.S. 390, 404–05 (1993); *Tabb v. Christianson*, 855 F.3d 757, 764 (7th Cir. 2017). Consequently, the court declines to consider the assertion of actual innocence as a freestanding claim.

Here, the court notes the parties' unusual treatment of three of the ineffective assistance of trial counsel claims. On post-conviction review, Mr. Carr raised claims that (1) trial counsel failed to interview Jan French; (2) trial counsel failed to request a voluntary manslaughter instruction; and (3) trial counsel failed to call Mr. Carr as a trial witness. ECF 25-18 at 30-38. Significantly, Mr. Carr did not present these claims in the habeas petition, but the Warden addressed these claims in the response brief, and Mr. Carr replied to these arguments in the traverse.[1] ECF 25 at 19-24; ECF 42-1 at 23-25. Petitioners cannot obtain habeas relief on claims not presented in the petition, and there is no need for opposing parties to address such claims. *See* Rule 2(c)(1) of the Rules Governing Section 2254 Cases ("The petition must specify all the grounds for relief available to the petitioner."); *Jackson v. Duckworth*, 112 F.3d 878, 880 (7th Cir. 1997) ("[A] traverse is not the proper pleading to raise additional grounds."). Nevertheless, for the sake of completeness, the court will briefly address the merits of these claims below.

---

[1] To clarify, the claims in the petition are arguably broad enough to encompass these claims. However, the attached memorandum of law explains the factual basis of the claims in the petition and does not mention trial counsel's failure to interview Jan French, to call Mr. Carr as a witness, or to request a voluntary manslaughter instruction. ECF 2-1 at 37-53. Mr. Carr filed a motion for leave to file an oversized traverse, which remains pending. ECF 42. The court grants this motion and will consider the attached traverse in resolving the habeas petition.

## PROCEDURAL DEFAULT

Before considering the merits of a habeas petition, the court must ensure that the petitioner has exhausted all available remedies in state court. 28 U.S.C. § 2254(b)(1)(A); *Lewis v. Sternes*, 390 F.3d 1019, 1025 (7th Cir. 2004). To avoid procedural default, a habeas petitioner must fully and fairly present his federal claims to the state courts. *Boyko v. Parke*, 259 F.3d 781, 788 (7th Cir. 2001). Fair presentment "does not require a hypertechnical congruence between the claims made in the federal and state courts; it merely requires that the factual and legal substance remain the same." *Anderson v. Brevik*, 471 F.3d 811, 814–15 (7th Cir. 2006) (citing *Boyko*, 259 F.3d at 788). It does, however, require "the petitioner to assert his federal claim through one complete round of state-court review, either on direct appeal of his conviction or in post-conviction proceedings." *Lewis*, 390 F.3d at 1025 (internal quotations and citations omitted). "This means that the petitioner must raise the issue at each and every level in the state court system, including levels at which review is discretionary rather than mandatory." *Id.* "A habeas petitioner who has exhausted his state court remedies without properly asserting his federal claim at each level of state court review has procedurally defaulted that claim." *Id.*

On direct appeal, Mr. Carr did not present any of his claims of trial court error to the Indiana Supreme Court with the exception of his claim that the trial court erred by failing to recuse itself for the second trial. ECF 25-7; ECF 25-15. However, on direct appeal, Mr. Carr framed this claim as a violation of state statute. ECF 25-15 at 3-6. When determining whether a claim has been fairly presented to the state courts as a federal claim, courts consider:

> 1) whether the petitioner relied on federal cases that engage in a constitutional analysis; 2) whether the petitioner relied on state cases which apply a constitutional analysis to similar facts; 3) whether the petitioner framed the claim in terms so particular as to call to mind a specific constitutional right; and 4) whether the petitioner alleged a pattern of facts that is well within the mainstream of constitutional litigation.

*Anderson v. Benik*, 471 F.3d 811, 815 (7th Cir. 2006). Here, Mr. Carr relied exclusively on a state statute, Ind. Code § 34-25-4-2, and state cases interpreting that statute when presenting this claim to the state courts. Therefore, he did not "alert the state courts to the federal underpinnings of his claim." *Perruquet v. Briley*, 390 F.3d 505, 519 (7th Cir. 2004).[2] Mr. Carr's claims of trial court error are procedurally defaulted.

On direct appeal, Mr. Carr did not present any of his prosecutorial misconduct claims. ECF 25-7; ECF 25-15. On post-conviction review, he presented a claim that the prosecution engaged in misconduct on post-conviction review, which does not present valid grounds for habeas relief. *See Pennsylvania v. Finley*, 481 U.S. 551, 557 (1987). He also presented other claims of prosecutorial misconduct, which the Indiana Court of Appeals found that Mr. Carr had waived because they could have been raised on direct appeal. ECF 25-21 at 14-15. As a result, Mr. Carr's cognizable claims of prosecutorial misconduct are procedurally defaulted.

On post-conviction review, Mr. Carr presented the following ineffective assistance of trial and appellate counsel claims to the Indiana Supreme Court: (1) trial counsel failed

---

[2] Moreover, it seems unlikely that Mr. Carr would have prevailed even if he had presented his claim that the trial court should have recused itself for the second trial as a federal claim. *See Liteky v. United States*, 510 U.S. 540, 551 (1994) ("It has long been regarded as normal and proper for a judge to sit in the same case upon its remand, and to sit in successive trials involving the same defendant.").

to challenge the search of the victim's residence; (2) trial counsel failed to interview Jan French; (3) trial counsel failed to request a voluntary manslaughter instruction; (4) trial counsel failed to call Mr. Carr as a trial witness; and (5) appellate counsel failed to challenge the search of the victim's residence. ECF 25-22. He also raised the claim that trial counsel failed to ensure that Mr. Carr received a speedy trial.[3] *Id.* Because Mr. Carr did not raise any other claims of ineffective assistance of trial and appellate counsel in the petition to transfer, they are procedurally defaulted.

Mr. Carr raises two arguments to excuse procedural default based on cause-and-prejudice. A habeas petitioner can overcome a procedural default by showing both cause for failing to abide by state procedural rules and a resulting prejudice from that failure. *Wainwright v. Sykes*, 433 U.S. 72, 90 (1977); *Wrinkles v. Buss*, 537 F.3d 804, 812 (7th Cir. 2008). Cause sufficient to excuse procedural default is defined as "some objective factor external to the defense impeded [his] efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 492 (1986).

Mr. Carr represents that ineffective assistance of appellate counsel caused the procedural default of the claims that he should have raised on direct appeal. "Meritorious claims of ineffective assistance can excuse a procedural default." *Richardson v. Lemke*, 745 F.3d 258, 272 (7th Cir. 2014). "But those claims must themselves be preserved; in order to use the independent constitutional claims of ineffective assistance of trial and appellate

---

[3] On post-conviction review, the Indiana Court of Appeals found that whether Mr. Carr received a speedy trial was res judicata, but it is unclear whether this finding suggests that the claim was procedurally barred or whether res judicata applied to the prejudice prong of the *Strickland* analysis and that the claim failed on the merits. For purposes of this opinion, the court will assume that Mr. Carr fairly presented this claim to the state courts.

counsel as cause to excuse a procedural default, a petitioner is required to raise the claims through one full round of state court review, or face procedural default of those claims as well." *Id.* Because Mr. Carr did not properly present any ineffective assistance of appellate counsel claims to the Indiana Supreme Court (with the exception of the claim that appellate counsel failed to challenge the search of the victim's residence), they are procedurally defaulted. And, because these ineffective assistance of appellate counsel claims are procedurally defaulted, they cannot serve to excuse the procedurally defaulted nature of his habeas claims.

The court also considers whether ineffective assistance of post-conviction counsel could excuse the procedurally defaulted nature of the ineffective assistance of trial counsel claims. As a general rule, "[n]egligence on the part of a prisoner's postconviction attorney does not qualify as cause." *Id.* The exception is that "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Martinez v. Ryan*, 566 U.S. 1, 9 (2012); *Brown v. Brown*, 847 F.3d 502 (7th Cir. 2017). "[A] prisoner must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Id.* at 14.

The procedurally defaulted claims asserting ineffective assistance of trial counsel include the failure to seek his pretrial release on bail, the failure to pursue the affirmative defense of mistake of fact, and failed to retain expert witnesses to rebut the prosecution's theory that the fatal wound was a contact wound. The court cannot find that the claim

regarding pretrial release on bail is substantial because it is unclear how pretrial release would have affected the outcome of the case. The claim that trial counsel failed to pursue a mistake of fact defense does not qualify under *Martinez* because Mr. Carr presented this claim to Fulton Superior Court on post-conviction review but abandoned it on appeal. PCR App. 99-106. With respect to the claim regarding expert witnesses, the record does not include any evidence on how the proposed expert witnesses might have testified.[4] Further, Mr. Carr did not list this claim in his post-conviction petition, PCR App. 99-106, which forecloses him from supplementing the record with evidence to support this claim in this federal habeas case, *see Shinn v. Ramirez*, 596 U.S. 366, 382-84 (2022); 28 U.S.C. § 2254(e)(2). As a result, the court also cannot find that this claim is substantial for purposes of *Martinez*.

The court next considers whether Mr. Carr's assertion of actual innocence serves to excuse procedural default. A habeas petitioner can overcome a procedural default by establishing that the court's refusal to consider a defaulted claim would result in a fundamental miscarriage of justice. *House v. Bell*, 547 U.S. 518, 536 (2006). To meet this exception, the petitioner must establish that "a constitutional violation has resulted in the conviction of one who is actually innocent of the crime." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). "[P]risoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *House*, 547 U.S. at 536–37. In

---

[4] Notably, the forensic pathologist retained by the defense at the first trial testified that the fatal wound was a contact wound consistent with the prosecution's theory. ECF 27-10 at 11-12.

this context, the court may consider evidence only if it is reliable and was not presented at trial. *Gladney v. Pollard*, 799 F.3d 889, 898 (7th Cir. 2015). "The reviewing court then considers the total record—all the evidence, old and new, incriminatory and exculpatory—and makes a probabilistic determination about what reasonable, properly instructed jurors would do." *Id.* "It is not the role of the court to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." *Id.* Actual innocence in the context of federal habeas law "means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998).

Mr. Carr argues that he is actually innocent because law enforcement unreasonably searched the victim's residence, but an unreasonable search does not suggest factual innocence. He also argues that he is actually innocent because the coroner declined to testify that the victim's fatal wound was a contact wound consistent with the prosecution's theory and because no scientific testing occurred to estimate the distance at which the victim was shot. However, the absence of expert testimony or scientific evidence on a particular point at trial is not new evidence. Consequently, Mr. Carr's assertion of actual innocence does not serve to excuse procedural default. Because Mr. Carr has not demonstrated a valid excuse to procedural default, the court will not further consider the procedurally defaulted claims.

LEGAL STANDARDS

A.  *Habeas Corpus Review.*

"Federal habeas review . . . exists as a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Woods v. Donald*, 135 S.Ct. 1372, 1376 (2015) (quotations and citation omitted).

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

> [This] standard is intentionally difficult to meet. We have explained that clearly established Federal law for purposes of §2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions. And an unreasonable application of those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice. To satisfy this high bar, a habeas petitioner is required to show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Woods,* 135 S. Ct. at 1376 (quotations and citations omitted). Criminal defendants are entitled to a fair trial but not a perfect one. *Rose v. Clark*, 478 U.S. 570, 579 (1986). To warrant relief, a state court's decision must be more than incorrect or erroneous; it must be objectively unreasonable. *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as

fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quotations omitted).

    B. *Ineffective Assistance of Counsel.*

To prevail on an ineffective assistance of counsel claim, a petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668 (1984). There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91.

The test for prejudice is whether there was a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability "sufficient to undermine confidence in the outcome." *Id.* at 693. In assessing prejudice under *Strickland* "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011). However, "[o]n habeas review, [the] inquiry is now whether the state court unreasonably applied *Strickland.*" *McNary v. Lemke*, 708 F.3d 905, 914 (7th Cir. 2013). "Given this high standard, even 'egregious' failures of counsel do not always warrant relief." *Id.*

DISCUSSION

A.  *Search of the Victim's Residence.*

Mr. Carr argues that he is entitled to habeas relief because trial counsel failed to challenge the search of the victim's residence. He contends that he had standing to challenge the search and that Jan French and Darlene Denton acted as agents for law enforcement. "The Fourth Amendment prohibits unreasonable searches or seizures, and courts exclude evidence obtained through an unreasonable search or seizure." *United States v. Burnside*, 588 F.3d 511, 517 (7th Cir. 2009). A search or seizure by a private party does not implicate the Fourth Amendment. *United States v. Shahid*, 117 F.3d 322, 325 (7th Cir. 1997). However, the Fourth Amendment does apply to a search or seizure by a party (even if otherwise a private party) who is acting as an instrument or agent of the government. *Id.* "To determine whether an individual was acting as a private party or as an instrument or agent of the government, [the court] examine[s] whether the government knew of and acquiesced in the intrusive conduct and whether the private party's purpose in conducting the search was to assist law enforcement agents or to further its own ends." *United States v. Ginglen*, 467 F.3d 1071, 1074 (7th Cir. 2006). "Other useful criteria are whether the private actor acted at the request of the government and whether the government offered the private actor a reward." *Id.* Further, "[the] capacity to claim the protection of the Fourth Amendment depends upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Minnesota v. Carter*, 525 U.S. 83, 88 (1998).

At the second trial, Jan French testified that Mr. Carr told her that he shot the victim as she drove him to his residence in Winamac, Indiana. Trial Tr. 369-97. After she dropped him off, she told Darlene Denton about the shooting and wanted to help the victim. *Id.* She knew that the victim lived at "Jim Carr's mom's," and Ms. Denton responded that she knew how to drive there but "didn't know how to tell anybody to get there." *Id.* They went back to the bar where they worked, called the police, and conveyed what Mr. Carr had told French. *Id.* The police told them, "Well let us know when you have an address." *Id.*

According to Ms. French, she and Ms. Denton drove the victim's residence to get an address and to "get sort of further instructions on what to do, what not to do." *Id.* When they arrived, they both went into the house to search for the victim. They began yelling outside and met with a neighbor, who gave them an address for the victim's residence. *Id.* They heard a dog barking, which turned their attention to the backyard where they found the victim in a wheelbarrow. *Id.* At some point, Ms. French called the police to tell them the address and to report the victim's condition. *Id.*

As Ms. Denton testified, she described the victim's residence as "Jim's mother's property." *Id.* at 406-20. Her testimony regarding the conversations with the police and arriving at the victim's residence were consistent with Ms. French's account, and she indicated that Ms. French primarily spoke with the police on the telephone. *Id.* She also testified that the police arrived within 15 to 20 minutes of her arrival. *Id.*

Officer Engstrand testified that he was the first officer at the victim's residence responding to Ms. French's call. *Id.* at 421-29. Ms. French and Ms. Denton were frantic

and pointed in the direction of the victim's body. *Id.* He observed the victim's body and taped off the area as a crime scene. *Id.* Detective Pryor was the next officer to arrive, and Officer Engstrand interviewed Ms. French and Ms. Denton at the sheriff's office. *Id.* Detective Pryor testified that he spoke with Ms. French, Ms. Denton, and Officer Engstrand when he arrived at the victim's residence. *Id.* at 433-56. He and Sergeant Nystrom conducted a walkthrough of the house and observed blood in the kitchen and dining area and that a gunshot had been fired through the bathroom wall. *Id.* He understood that Mr. Carr lived in the next county over and that the Pulaski County Sheriff's Department were monitoring that residence until they could obtain a search warrant. *Id.* Sergeant Nystrom testified that he arrived at the victim's residence to gather evidence consistent with Detective Pryor's account. *Id.* at 475-536.

At an evidentiary hearing at the post-conviction stage, the prosecutor testified that they did not obtain a warrant for the search of the victim's residence. ECF 27-13 at 46-78. At the time of the search, he understood that Mr. Carr lived in Winamac and did not understand a particular connection between Mr. Carr and the victim's residence. *Id.* He did not recall observing any particular vehicles, a name on the mailbox, the curtains, or Mr. Carr's wallet. *Id.* He did not speak with Ms. French or Ms. Denton. *Id.* He did not know that the victim's residence was connected to Mr. Carr's mother. *Id.* He obtained a warrant to search Mr. Carr's residence in Winamac. *Id.* Investigator Lawson testified that he understood from Detective Pryor that Mr. Carr lived elsewhere and that only the victim lived at the residence. *Id.* at 78-92. He did not look up the license plates on the vehicles. He did not recall a name on the mailbox, the curtains. *Id.*

Sergeant Nystrom testified that he did not recall a name on the mailbox or the curtains. *Id.* at 92-119. He did not look up the license plates on the vehicles. *Id.* He spoke with only other members of law enforcement at the victim's residence. *Id.* He understood that they did not need a warrant to search the victim's residence. *Id.* He discovered Mr. Carr's jacket and wallet in the residence but did not question the decision not to obtain a warrant. *Id.* He did not recall any sign that individuals other than the victim lived there. *Id.* On cross-examination, Sergeant Nystrom testified that the driver's license contained Mr. Carr's address in Winamac. *Id.*

Trial counsel testified that he did not recall discussing who owned the victim's residence with Mr. Carr, but he recalled that Mr. Carr had some connection with it as family property. *Id.* at 119- 58. He did not discuss whether Ms. French acted as an agent of law enforcement with Mr. Carr. *Id.* Trial counsel from Mr. Carr's first trial did not suggest that evidence from the victim's residence should be suppressed. *Id.*

Ms. French testified that she called the police at the tavern where she worked and told them that "somebody had shot somebody" and that "we didn't know what the address was." *Id.* at 141-57. The police asked her to let them know if she could find an address. *Id.* Later, the police asked her if they needed an ambulance, but she did not know the victim's condition at that time and went to look for the victim. *Id.* She told the police that the victim "had been living out there and knew that this was Jim's house because it was his mom's house." *Id.* The police told her that they would meet them at the residence. *Id.* On cross-examination, she clarified that she understood the house to be Mr. Carr's mother's house and that Mr. Carr helped her take care of the property because she was

16

in a nursing home. *Id.* She conceded that she did not know whether she described the house to the police as Mr. Carr's house or his mother's house. *Id.* She understood that Mr. Carr stayed at his mother's house a few times. *Id.*

Valerie Powers testified that, at the time of the murder, Mr. Carr lived with her in Winamac as her significant other. *Id.* at 158-82. Mr. Carr's mother moved from the residence in the winter of 2005. *Id.* Mr. Carr monitored the property, mowed, and stored personal items in the house. *Id.* He also had a shop and a trailer on the property. *Id.* The shop had turquoise curtains made by his mother. *Id.* The mailbox had the name "Carr" on it. *Id.* Mr. Carr was the trustee of the property at the time of the murder. *Id.* Mr. Carr allowed the victim to stay at the property to help him take care of it and to sell personal property. *Id.* Mr. Carr often went to the property when the victim stayed there and without any permission of the victim. *Id.* Mr. Carr had his mother's power of attorney. *Id.*

Officer Engstrand's incident report was submitted as an exhibit. ECF 27-11 at 102-14. According to this report, Ms. French told him that she had driven Mr. Carr to his home in Winamac and then drove with Ms. Denton to the residence where the victim was living. *Id.* It indicates that law enforcement obtained a warrant to search the Winamac residence but did not do so to search the victim's residence. *Id.*

The Indiana Court of Appeals rejected the claim that trial counsel should have investigated whether Ms. French and Ms. Denton acted as agents for law enforcement, finding no evidence to support this claim. ECF 25-21 at 17-19. With respect to the claim that trial counsel should have moved to suppress the search of the victim's residence, the

appellate court noted that the trial court had found that Mr. Carr lacked standing to challenge the search. *Id.* The appellate court further concluded that Mr. Carr had not shown that he was prejudiced by the search given his confession to Ms. French and given that trial counsel strategically decided to challenge whether Mr. Carr had the requisite culpability for murder. *Id.*

After reviewing the state court record, the court cannot find that the state court made an unreasonable determination of these claims. According to their testimony, Ms. French and Ms. Denton entered the victim's residence solely for the purpose of obtaining medical assistance for the victim, and the record contains no evidence that they had some other motive. Though law enforcement asked them for an address, they did not direct either woman to enter the house, and they did not offer them any award. Further, it is unclear how Ms. French's or Ms. Denton's alleged status as agents of law enforcement could have prejudiced Mr. Carr given that they did not offer any material testimony as to what they saw in the house.

On the issue of standing, it is unclear whether Mr. Carr had a reasonable expectation of privacy in the victim's residence. Ownership and access to property, by themselves, are not sufficient to establish a reasonable expectation of privacy. *See California v. Ciraolo*, 476 U.S. 207, 215 (1986) ("[i]t is unreasonable for respondent to expect that his marijuana plants were constitutionally protected from being observed with the naked eye from an altitude of 1,000 feet."); *United States v. Concepcion*, 942 F.2d 1170, 1172 (7th Cir. 1991) ("[A] tenant has no reasonable expectation of privacy in the common areas of an apartment building.").

The reasonableness inquiry appears to turn on the issue of whether Mr. Carr's relationship to the victim more closely resembled a landlord-tenant relationship or a co-occupant relationship. Landlords do not typically have a reasonable expectation of privacy in their occupied rental units. *See Georgia v. Randolph*, 547 U.S. 103, 112 (2006) ("A person on the scene who identifies himself, say, as a landlord or a hotel manager calls up no customary understanding of authority to admit guests without the consent of the current occupant."); *Aberdeen Apartments v. Cary Campbell Realty All., Inc.*, 820 N.E.2d 158, 165 (Ind. Ct. App. 2005) ("The landlord grants to tenants rights of exclusive possession to designated portions of the property."); Restatement (Second) of Property, Land. & Ten. § 1.2(a) (1977) ("The landlord-tenant relationship will not commence until the tenant has a present right to possession . . . The right to possession is normally transferred if the arrangement contemplates that the transferee will assume a physical relationship to the leased property which gives him control over and the power to exclude others from the property."). Mr. Carr described himself as renting the house to the victim, ECF 27-5 at 9, 17, and the record contains little evidence suggesting that Mr. Carr co-occupied the house at the time of the victim's death. As a result, the court cannot find that the Fulton Superior Court rendered an unreasonable determination that Mr. Carr would have lacked standing to challenge the search of the victim's residence.

Notably, Mr. Carr may not have prevailed on a motion to suppress the search even if he had a reasonable expectation of privacy in the victim's residence. This is because "the Fourth Amendment allows for some mistakes on the part of government officials, giving them fair leeway for enforcing the law in the community's protection." *Heien v.*

*North Carolina*, 574 U.S. 54, 60–61 (2014). The record contains no indication that law enforcement was aware of circumstances suggesting that Mr. Carr had a reasonable expectation of privacy in the victim's residence. According to Ms. French's police interview and trial testimony, she did not inform the police that Mr. Carr co-occupied or regularly used the property; instead, she informed the police that she had driven Mr. Carr home at a location in another county.

On post-conviction review, Ms. French testified that she told the police that the victim "had been living out there and knew that this was Jim's house because it was his mom's house." Even crediting this testimony, which was taken and introduced new information nearly twelve years after the murder and on which she wavered on cross-examination, it is unclear how law enforcement would have parsed this ambiguous sentence at the time of the search. In American society, a parent's ownership of property does not necessarily imply any property rights for their adult child; and, as explained already, ownership alone does not implicate the right to privacy. By contrast, according to Ms. French's testimony, she straightforwardly said the victim "was living there."

The court also cannot find that the determination that the search of the victim's residence did not prejudice was unreasonable. The record includes Mr. Carr's confession to Ms. French, an incriminating statement made during his arrest, and the victim's corpse found outside in a wheelbarrow. Even setting aside the search of the victim's residence, the identity of the shooter or the victim's manner of death was undisputed. The sole material disputed issue was Mr. Carr's culpability at the time of the shooting, and the evidence discovered during the search shed little light on this issue. Consequently, the

claim that trial counsel rendered ineffective assistance by failing to challenge the search of the victim's residence is not a basis for habeas relief.

B.  *Abandonment of Speedy Trial Rights.*

Mr. Carr argues that he is entitled to habeas relief because trial counsel abandoned his right to a speedy trial by allowing delays to be charged to the defense and by failing to pursue a motion under Ind. R. Crim. P. 4, which, subject to certain exceptions, requires criminal defendants to be released if they do not receive a trial within six months. The focus of this claim is on the delay occurring before the first trial.

The factors for assessing an asserted violation of the right to a speedy trial include the following: "whether delay before trial was uncommonly long, whether the government or the criminal defendant is more to blame for that delay, whether, in due course, the defendant asserted his right to a speedy trial, and whether he suffered prejudice as the delay's result." *Ashburn v. Korte*, 761 F.3d 741, 751–52 (7th Cir. 2014). "The first factor, the length of delay, acts as a triggering mechanism; unless a presumptively prejudicial amount of time elapsed in the district court, it is unnecessary to conduct a searching analysis of all the factors." *United States v. Oriedo*, 498 F.3d 593, 597 (7th Cir. 2007). "[D]elays that approach one year are presumptively prejudicial." *Id.* "Actual prejudice to the defense is the most serious concern raised by a delay because it may skew the fairness of the entire system." *Id.* at 600. Here, the prosecution initiated criminal charges against Mr. Carr on November 8, 2006, and the first trial did not take place until April 27, 2009. Because trial did not occur within one year, the delay is presumptively prejudicial, and further consideration is necessary.

On direct appeal, Mr. Carr argued that his right to a speedy trial under the Constitution and Ind. R. Crim. P. 4 had been violated but conceded that Ind. R. Crim. P. 4 was stricter than the constitutional standard. ECF 25-3 at 9-13. The Indiana Court of Appeals adopted that formulation and conducted an analysis only under Ind. R. Crim. P. 4. ECF 25-6 at 6-11. The Indiana Court of Appeals rejected the claim, and the Indiana Supreme Court affirmed that decision. *Id.*; ECF 25-9 at 2-4.

On post-conviction review, the Indiana Court of Appeals found that the doctrine of *res judicata* barred the claim that trial counsel abandoned his right to a speedy trial because the Indiana Supreme Court rejected a speedy trial claim on direct appeal. ECF 25-21 at 11-12. On post-conviction review, Mr. Carr attempted to distinguish his post-conviction claim from his direct appeal claim by representing that he challenged his rights under Ind. R. Crim. P. 4 on direct appeal but that, on post-conviction, he raised a claim that trial counsel abandoned his constitutional right to a speedy trial. ECF 25-18 at 38-41. Given the formulation of the speedy trial claim on direct appeal, it was not unreasonable for the Indiana Court of Appeals to conclude that *res judicata* barred further consideration of the constitutional speedy trial issue on post-conviction review.

Further, Mr. Carr has not demonstrated trial counsel caused him prejudice by allowing delays to be charged to the defense instead of more vigorously pursuing a speedy trial. He does not suggest that the delays affected his ability to defend himself at trial. Instead, Mr. Carr appears to assume that, absent the trial counsel's cooperation, the prosecution would have allowed delays to accrue until his speedy trial rights had been clearly violated, resulting in the dismissal of his case. This assumption does not account

for the reasonable likelihood that the prosecution and the trial court would have expedited the trial date if trial counsel had more vigorously advocated for it.

For example, the record reflects that, on February 22, 2007, the trial court continued the trial date from March 21, 2007 to August 20, 2007, based on the parties' representations that more time was required to obtain an autopsy report. ECF 24-17 at 3-7. The record indicates that the physician expert was primarily responsible for this delay (*id.* at 8-31), but the prosecution may have responded to a speedy trial objection by making additional efforts to expedite the expert's completion of the report, by choosing another expert to prepare the report, or by simply forgoing the autopsy report and a medical expert altogether.[5]

At other times, trial counsel's decision not to pursue a speedy trial more vigorously was a strategic decision. For example, on November 7, 2007, trial counsel sought a continuance for the purpose of retaining a forensic pathologist, and the trial court continued the trial to May 2008. And on February 22, 2007, trial counsel jointly moved for a continuance due to "missing pieces of evidence such as the autopsy report, things of that nature," suggesting that trial counsel believed that the defense would benefit from the creation of an autopsy report.[6] ECF 24-17 at 3-7. As a result, the claim that trial counsel abandoned the right to a speedy trial is not a basis for habeas relief.

---

[5] As mentioned above, the victim's manner of death was not in dispute, and though the prosecution sought to bolster its case by adducing testimony from the medical expert that the wound appeared to be the result of the shotgun's being fired in direct contact with the victim's body, the medical expert refused to so testify. Trial Tr. 561-600.

[6] According to the record, the prosecution did not receive the report until August 6, 2007. ECF 24-17 at 12-13. The prosecution was constitutionally required to disclose material, exculpatory

C. *Remaining Ineffective Assistance of Trial Counsel Claims.*

Mr. Carr argues that he is entitled to habeas relief because trial counsel failed to interview Ms. French, failed to call Mr. Carr to testify at the second trial, and failed to request a voluntary manslaughter instruction. He maintains that Ms. French could have testified that Mr. Carr told her that he thought the gun did not work. He further maintains that he could have offered testimony that would have supported a request for a voluntary manslaughter instruction.

Following Mr. Carr's arrest, on November 5, 2006, Detective Pryor interviewed Mr. Carr. During this interview, Mr. Carr represented as follows:

> **Carr:** And the weapon that was used is my gun. And [the victim] had been stealing things from me for quite some time. And I just questioned him about whether or not I still had a .22 that was there at the house, and I'm sure you've been there. And also my .16 gauge. Now he had told me, at one point, that all the shells for the .16 gauge were inoperable, okay? I was angry with him, and I was asking him about that, and he brought them out. All I'm telling you is that it was not a planned thing. That he brought them out and put them in front of me and we were angry. Well, I was angry with him, I don't know if he was angry with me or not, I have no idea.
>
> * * *
>
> Several months ago, my mother was in a nursing home, and in order to satisfy Medicaid, I either had to sell the farm or rent the farm. I did not want to sell. I happened in be in Monterey Corner Tavern and [the victim], who I have known for many years, was there too. And he was down on his luck not doing well, in fact, he was living in his car. So this seemed a logical situation for me to invite him to live in the house and rent it. And I was paying the rent. To less the burden of that, which was only $150 a month, but I only work part time as I don't have a great deal of money. As I told him earlier yesterday, I spent over $4,000 keeping him in that house and in

---

evidence to defense, and the state rules required disclosure of expert reports made in connection with the case, Ind. R. Crim. P. 2.5(B)(2)(d), but the court is unaware of any legal authority that would have required the prosecution to facilitate the creation of an autopsy report.

the meantime he has stolen from me many, many times, and I was finally able to get him a job, and he has been working for the last two weeks. Okay? In Kewanna and he got his first paycheck Thursday and our agreement was that he would pay me $40 a week, which would satisfy the $150 a month rent and he had borrowed $20 from my girlfriend to make it through and as we were discussing this – and I had told him that the first paycheck was his to get himself around and so on, he was driving my truck. And as we were discussing this, I had told him that he could have that first check. I guess I was kind of insistent. Fact was that he was drunk and it just bothered me a great deal and I was drunk too so. Well, as we were talking, I just finally said, do I still have these guns? He had stolen the pistol from me and sold it to somebody else, and I found out about that, and I had asked him several times if he had seen that pistol, and he had told me no. Finally, it came out that he had taken it and sold it to somebody else, and I was able to get it back. I guess the bottom line was I just didn't trust him and then yesterday we were going through the whole thing, you know, and I just didn't trust him, and I asked him about the guns whether he had sold those or not because he had sold a cookie jar of my mother's personal belongings, and I had told him never to take things out of the house or selling things out of the barn, things I have accumulated over the years. I was trying to-- I have no idea how much money he took in. I have no idea what he sold things for. So I picked up the gun, and I was holding it. At one point, I cocked it and looked at it, and he said, "Do it, do it do it, do it," and not the first time or the second time or the third time, one of those times—finally, I did it.

* * *

So you know, I bought what I could get. And I bought as much of it as I can get. And [the victim] had been going through everything that I had, and he found those and told me they were no good. And that they wouldn't fire yadda, yadda, yadda. And you know I lost all trust for him anyways. Well, I guess he told me it was loaded, but he had also told me that he had fired every bit of ammunition that I had or tried it out, and it didn't work, none of it worked, you know. There was nothing left.

**Detective Pryor:** Did you even know that the gun was loaded?

**Carr.** He told me it was, but I, you know . . . I didn't . . .

**Detective Pryor:** Didn't look, don't know, didn't really know?

**Carr:** Did not really look.

ECF 27-5 at 20, 23, 27-28.

On the same night, Officer Engstrand interviewed Ms. French, and his incident report reads as follows:

> Jan advised that James appeared to be drunk and that he had been drinking. Jan further advised that upon leaving the tavern she drove James home in his green Windstar van and Darlene followed in her vehicle to pick her up. Jan advised that when she reached a location of U.S. 35 in Winamac, James advised her that he had been in an argument with [the victim] and all he wanted him to do was tell him the truth but he would not. Jan stated that this is when James told her that he had kill [the victim] and told her not to tell anyone as he was going to talk to an attorney the next day. Jan stated that she then called our department and her and Darlene drove to the residence which [the victim] was living.

ECF 27-11 at 105.

Investigator Lawson reviewed the videotape of the same interview and summarized it as follows:

> Jane said that Jim Carr gave her directions to get to his residence and as they turned onto U.S. 35 that Jim during their conversation stated that he was going to prison. Jane said she said what and told that Jim she was driving him home so he couldn't get a DUI. Jan said that Jim replied no I just kill [the victim]. Jan said she replied what again. Jan stated that Jim said that Allen was lying to him and stealing from him and he just wanted [the victim] Allen to tell the truth. Jan relayed that Jim said he wouldn't tell me the truth so I pulled the trigger.

> Jan said that once at the Carr residence Jim told her not to tell anyone and he would get a lawyer in the morning. Jan said that Jim said after the lawyer statement that he knew she would have to do what she had to do. Jan said that Jim spoke to Darlene and thanked her for what she had done and then Jim said to Darlene don't believe anything she is about to tell you.

*Id.* at 122-23.

At the first trial, the prosecution presented Ms. French as a witness. ECF 27-8 at 86-126. On direct examination, the prosecution asked numerous questions to illicit the details of her conversation with Mr. Carr regarding the death of the victim, including asking her whether she recalled "exactly what he told [her] that night." *Id.* at 86-102. After reviewing her statement to the police, she testified as follows:

> **Prosecution:** As far as you can remember, that's what he said to you?
>
> **French:** Right.
>
> **Prosecution:** That's what Jim said to you?
>
> **French:** Right.
>
> **Prosecution:** So he wasn't telling you that night that it was an accident, was he?
>
> **French:** No.
>
> **Prosecution:** You never got that impression at all, did you?
>
> **French:** I, I really don't, I mean, I, I don't know what happened, you know.

*Id.* at 117-18.

The prosecution also presented a video recording of Mr. Carr's interview. ECF 27-5 at 15-44. Trial counsel requested instructions for the lesser included offenses of criminal recklessness, involuntary manslaughter, and felony battery, which the trial court denied. ECF 27-10 at 26-30. The trial court provided instructions on voluntary manslaughter and murder, and the jury found Mr. Carr guilty of murder. *Id.* at 69, 78-80.

On the direct appeal of the first trial, Mr. Carr argued that the interview violated his *Miranda* rights and that it should not have been admitted. ECF 25-3 at 18-20. He

contended that the interview was material because "[t]there was no other evidence at trial as to intent or the specific of the shooting other than Carr's statement." *Id.* The Indiana Court of Appeals rejected this argument, finding that the interview was admissible because Mr. Carr did not unambiguously assert his right to counsel during the interview. ECF 25-6 at 11-19. Mr. Carr also argued that the trial court should have given the jury instructions on criminal recklessness, involuntary manslaughter, and felony battery. ECF 25-3 at 23-25. The Indiana Court of Appeals also rejected this argument, finding no serious evidentiary dispute regarding culpability. ECf 25-6 at 24-28. The Indiana Court of Appeals found no dispute that Mr. Carr "grabbed a firearm, pointed it directly at [the victim's] head, and shot [the victim] in the fact at very close range." *Id.* The appellate court specifically noted Mr. Carr's statement that "[a]t one point, I cocked it and looked at it, and he said, 'Do it, do it do it, do it,' and not the first time or the second time or the third time, one of those times—finally, I did it." *Id.*

At the next stage of this direct appeal, the Indiana Supreme Court reversed the Indiana Court of Appeals, finding that Mr. Carr's recorded interview should have been excluded. ECF 25-9 at 4-15. The Indiana Supreme Court reasoned that Mr. Carr unambiguously invoked his right to counsel during the interview and that Detective Pryor did not scrupulously honor this invocation. *Id.* The Indiana Supreme Court further concluded that the admission of the interview was not harmless error because it "contained considerable details regarding his state of mind during the killing – details not provided by other evidence." *Id.* The Indians Supreme Court also noted that Mr. Carr primarily relied on the recorded interview as evidentiary support for the lesser-included

offense instructions and opined that the issue was not likely to appear at retrial because the recorded interview would be excluded. *Id.* at 17-18.

At the second trial, the prosecution again presented Ms. French as a witness. Trial Tr. 369-403. The prosecution asked her to describe "specifically" or "exactly what he said" and repeatedly asked questions to illicit additional details regarding her conversation with Mr. Carr regarding the victim's death. *Id.* The prosecution again refreshed her recollection with her statements to the police. *Id.* On redirect, Ms. French testified as follows:

> **Prosecution:** Did he ever say he accidentally killed him?.
>
> **French:** No.
>
> **Prosecution:** Did he ever say he killed him in a struggle?
>
> **French:** No.

*Id.* at 402.

At the defense stage, trial counsel presented Sally Tate, a neighbor who overheard Mr. Carr and the victim on the night of the murder, and she testified as follows:

> **Trial Counsel:** So when you were [burning trash], were you relatively close to the barn on your property?
>
> **Tate:** Yeah, pretty close. I mean I was on the west side of my house, but the barn is real close to my house, so, yeah, it was, it was pretty close.
>
> **Trial Counsel:** What did you hear?
>
> **Tate:** I just heard a couple of men talking and I could just hear 'em 'cause the night was clear, you know, it was calm, and I just heard voices talking.
>
> **Trial Counsel:** Did you hear any tones of anger or a fight going on between those two men?

**Tate:** No. Not at all. There were just talking. And, Like I said, it was a clear night, so everything carries pretty good on a clear night. So, yeah, I just heard 'em talking.

**Trial Counsel:** Did you hear them telling at each other, screaming at each other, anything like that?

**Tate:** No.

Trial Tr. 684-90.

Trial counsel requested an instruction on reckless homicide, which the trial court denied. *Id.* at 709-17. At closing, trial counsel used Sally Tate's testimony to argue Mr. Carr and the victim were not angry and fighting with each other in an effort to minimize the prosecution's showing of intent. *Id.* at 737-47. The trial court gave a murder instruction, and the jury found Mr. Carr guilty. *Id.* at 756, 766-69. On direct appeal, Mr. Carr argued that the trial court erred by refusing to give a reckless homicide instruction, relying on Dr. Prahlow's testimony on cross-examination in response to hypothetical scenarios in which he indicated that such scenarios were possible. ECF 25-11 at 14-18. The Indiana Court of Appeals rejected this claim, reasoning that no evidence supported these hypothetical scenarios and that French's testimony regarding Mr. Carr's statements and the manner of death undermined these the hypothetical scenarios. ECF 25-14 at 6-10.

On post-conviction review, trial counsel for the second trial testified as follows:

**PCR Counsel:** During the course of your discussion with Mr. Carr, did you discuss with him having him take the stand to establish some probative evidence of the lesser included offense?

**Trial Counsel:** Yes we did talk about whether he would testify.

**PCR Counsel:** And what was his representation to you? What is your recollection of those conversations?

**Trial Counsel:** My recollection of those conversations was that James' first instinct was that he wanted to talk to the jury. And that my advice to him that he not. That I thought that would be counterproductive. And that he ultimately consented and went along with my advice.

\* \* \*

**PCR Counsel:** Did you interview Jan French during the course of your representation of Mr. Carr?

**Trial Counsel:** I remember questioning her. I don't remember interviewing her separately.

**PCR Counsel:** When you say questioning her, you mean questioning her on the stand?

**Trial Counsel:** Sure. Questioning her on the stand, or reviewing her previous testimony. I don't remember if we talked at length between those two reviews of evidence.

**PCR Counsel:** If at all?

**Trial Counsel:** Yes.

\* \* \*

**PCR Counsel:** Did you discuss with Jim the merits of a voluntary manslaughter lesser included as a strategy during the second trial?

**Trial Counsel:** We had talked about two or three different lesser includeds. The voluntary manslaughter, I think, was one that was brought up at the first trial. And we went with reckless homicide because that was something that had not been considered at the first trial. Therefore, I didn't believe I'd have the same difficulty in overcoming the judge's decision that he made in the first trial on some of the other lesser included charges. And I'd have to look at my notes and probably the briefs to remember exactly which charges those were.

**PCR Counsel:** During the first trial you're talking about?

**Trial Counsel:** Yeah.

**PCR Counsel:** Do you remember what the-- voluntary manslaughter and reckless homicide, and do you remember any others that you discussed with Mr. Carr?

**Trial Counsel:** Well, I would have discussed the ones that were brought up at the first trial, and again, I don't remember all of those. But there were two or three which I then suggested. I think it was some form of battery. And we discussed reckless homicide as being one that might fit the facts, and yet was not specifically dealt with at the first trial. Therefore, possibly making it more like the judge might allow that instruction at the conclusion of the second trial.

**PCR Counsel:** The judge ultimately denied the reckless homicide instruction at the conclusion of the second trial, did he not?

**Trial Counsel:** Yes.

**PCR Counsel:** At that point, is there a particular reason you didn't offer any other lesser includeds as an alternative for the judge's consideration?

**Trial Counsel:** I did not believe it would be useful.

* * *

**Attorney Brown:**[7] The first trial was reversed because of the admission of the videotaped confession, correct?

**Trial Counsel:** Yes.

**Attorney Brown:** As far as the second trial is concerned, or the second trial, if presented to testify, then that videotaped confession would have come right back into evidence, correct?

**Trial Counsel:** I think there certainly are parts of it that would have been admissible.

**Attorney Brown:** Certainly the incriminating parts.

---

[7] Richard Allen Brown represented the State of Indiana on post-conviction review. He also served as the prosecutor at both the first and second trial.

**Trial Counsel:** Uh-huh.

**Attorney Brown:** Actually I mean basically it's your understanding that case law is that suppression, or [the exclusionary rule] does not protect even an illegally obtained statement in those circumstances because it's not intended to—a police officer can't predict that the defendant is going to testify. And maybe change his story and all that. It's meant to keep the state from using it initially. Is that a fair statement?

**Trial Counsel:** It's not intended to give you the opportunity to lie, so I assume what you said is a fair statement.

**Attorney Brown:** So was that a factor in terms of when you discussed the merits of him testifying? Was that discussed—that is, the concept that if he did, he would be right back to square one with that thing coming back in?

**Trial Counsel:** That was part of it sure.

**Attorney Brown:** And obviously there would be other factors of whether you want a guy to testify or not. Or whether it would be beneficial to him. But that certainly would have happened?

**Trial Counsel:** Yes.

**Attorney Brown:** The same would be true in order to show that there was some type of an argument, or a struggle, or any of those things. Now, as to directly show that, he would have had to testify, correct?

**Trial Counsel:** Yeah.

* * *

**Attorney Brown:** You had the first trial's transcript available in order to prepare for the second trial, correct?

**Trial Counsel:** Yes.

**Attorney Brown:** And you also had—as far as discovery from the original attorneys, you had a transcribed statement of Jan French available to you. Do you recall that?

**Trial Counsel:** Yes.

**Attorney Brown:** And, of course, the police reports would have referenced what they talked to her about, things like that.

**Trial Counsel:** Yes.

**Attorney Brown:** Now, given the fact you had a statement taken by the police, you had an actual trial testimony of Jan French, did you really see any reason to independently interview her?

**Trial Counsel:** I probably did not have a compelling need to do that given all those previous sown statements.

* * *

**Attorney Brown:** On the potential of voluntary manslaughter, that involves the killing in a sudden heat. Again, that would have pretty much required the defendant to testify, right? To get to that point? In this case? Put it another way. Let me withdraw that. To your knowledge, was there any other witness or evidence that could have established that they were in some type of an argument that created a sudden heat?

**Trial Counsel:** No, that had to be from them.

ECF 27-12 at 119-40.

Ms. French also testified during post-conviction proceedings:

**PCR Counsel:** Mrs. French, this morning, I asked you if anyone had ever asked you about whether Jim made statements to you about whether the gun was loaded or not in this case. Do you recall that?

**French:** Yes.

**PCR Counsel:** And no one has ever asked you about that from the Defendant's side.

**French:** No.

**PCR Counsel:** Okay. Would you tell the Court what did Jim tell you about whether the gun was loaded and his communications with—

**French:** He just told me that the gun, as far as he knew, the gun didn't work.

**PCR Counsel:** And why did he believe that the gun didn't work?

**French:** Because [the victim] had made the statement that it didn't work.

\* \* \*

**Attorney Brown:** You gave a statement to the police, right? Do your remember that? Do you remember doing that?

**French:** Yeah.

**Attorney Brown:** That night.

**French:** Right.

**Attorney Brown:** After they met with you at [the victim's] house or [the victim's] whatever you want to call it.

**French:** And then they came into it.

**Attorney Brown:** They came in the station and they took a statement from you. Do you remember doing that?

**French:** Right.

**Attorney Brown:** And then you testified at two separate trials, right?

**French:** Right.

**Attorney Brown:** You've never said that before today in any of those statements, correct?

**French:** I was never asked those questions.

*Id.* at 141-57.

Mr. Carr testified during post-conviction proceedings as follows:

**Carr:** I looked at the house and there was dog poop all over the place. And you know it wasn't very cleanly or anything. And then when he showed up, he was drunk. And I knew he had been to my place of work in an intoxicated state. So we had an argument over that. I guess I could say an argument. And when we got that settled. And both of us being alcoholics,

35

we had done some pretty serious drinking. And, at one point, I had said something to him about my guns. I wanted to know if he, you know, if he still had my guns, because I hadn't seen them around. And so he went off into the other room and came in and sat them down in front of me. And I didn't look to see if they were loaded. And through the course of the afternoon, I fiddled around with the guns. And, you know, there's a hammer, so I was cocking it and releasing it with the trigger. And at some point there in the evening, you know, he was coming back to the table, at least this is the way that I recall. There are so many things that are so dumb, I'm not sure that I totally remember them, or they're things that I have come to the conclusion about, according to things that I've read. So anyway, I believe that he was walking back towards the table, and he tripped over a little rise that was between the dining room and the kitchen. And he fell into the table and I guess I had the gun cocked, and it went off, and it hit him, and he was dead.

* * *

**PCR Counsel:** There's been some discussion in the statement you gave to the police and there's been some discussion from Ms. French that you had said something about he said the gun didn't work.

**Carr:** Well, it's not that he said it didn't work. He told me several times that there were no shells for the gun, because originally when he first moved in, he asked if he could hunt deer on my property and I said yes. It's my property, I don't think you need a license. And I said, in fact, I think I even have a little shotgun around here. And he said, well, I've already found that. And I said, well, okay, I think I've got some deer slugs around here someplace too. And he says, oh, yeah, well, I had those and they didn't work. I tried to shoot them, and they didn't work. So I threw them all away. And then a couple weeks later, maybe a little longer than that, he mentioned something about the deer again. And I said, oh yeah, about the gun and the shells. And I said, oh yeah, you threw those all away. Yeah, he said, I threw those all away. And I found out later that he had sold them to a neighbor for some money to go drinking with. That's what I was aware of, that I did not think there were any shells for the gun.

* * *

**Attorney Brown:** You said in your statement, he said to you, "Do it, do it, do it, do it." So I did it." That's what you said.

**Carr:** [PCR counsel] and I were just talking about that. And I believe that was a ploy on my part to try and get sympathy with the police.

**Attorney Brown:** Oh, so you were lying to the police?

**Carr:** Well, basically, yeah.

**Attorney Brown:** So we're supposed to believe you lied to the police and you're telling the truth now?

**Carr:** Yeah.

**Attorney Brown:** Wouldn't that have been a better story that it was unintentional? I mean, how do you get sympathy from police when you say, "I just shot the guy because he said to, he told me to"? That's better than, "It was an accident?"

**Carr:** Well, you know how drunks think. Maybe, I don't know.

*Id.* at 183-94.

On appeal, the Indiana Court of Appeals rejected the claim that trial counsel should have interviewed Ms. French, finding no deficient performance or prejudice. ECF 25-21 at 20-21. The appellate court reasoned that trial counsel had no reason to suspect that interviewing Ms. French would have had information that she had not disclosed to the police or at the first trial. *Id.* The appellate court noted that Mr. Carr did not notify trial counsel of this possibility and that Ms. French did not reveal this information until sometime after she had testified in the second trial. *Id.*

The Indiana Court of Appeals next rejected the claim that trial counsel should have called him as a witness, finding no deficient performance. *Id.* at 21-23. The appellate court observed that Mr. Carr had prevailed on the direct appeal of the first trial on the basis that his video-recorded interview, which included a "complete confession to the offense"

should have been suppressed. *Id.* The appellate court reasoned that calling Mr. Carr to testify would have rendered the video-taped interview fully admissible and that allowing admission of the interview more closely resembled deficient performance than declining to call Mr. Carr to testify. *Id.*

The Indiana Court of Appeals also rejected the claim that trial counsel should have requested a voluntary manslaughter instruction. *Id.* at 23-25. The appellate court reasoned that the trial court had refused to provide a voluntary manslaughter instruction at the first trial due to a lack of a serious evidentiary dispute regarding culpability. *Id.* The appellate court noted that the Indiana Supreme Court's determination after the first trial that the video-taped interview served as the evidentiary basis for the lesser included offenses and that the Indiana Supreme Court found that the lesser included offenses dispute would be unlikely to arise at the second trial because the interview would be excluded. *Id.* Based on this finding, the Indiana Court of Appeals found that a voluntary manslaughter instruction would likely have been denied at the second trial. *Id.*

After reviewing the record, the court cannot find that the state courts acted unreasonably with respect to these claims. The court agrees that the decision not to call Mr. Carr as witness was a reasonable strategic decision. *See United States v. Norwood*, 798 F.2d 1094, 1100 (7th Cir. 1986) ("[T]he decision not to place the defendant on the stand is a classic example of what might be considered sound trial strategy."). The video-recorded interview contained Mr. Carr's statements that he had aimed shotgun at the victim and fired it, and a jury had previously convicted him at a trial in which the video-recorded interview had been admitted. Mr. Carr's testimony at the post-conviction stage

contradicted the interview, so the prosecution would have been entitled to present the video-recorded interview at the second trial for purposes of impeachment. *See Winsett v. Washington*, 130 F.3d 269, 277 (7th Cir. 1997) ("[T]he prosecution [may] use for impeachment purposes a defendant's statement obtained after police willfully denied the defendant's request to consult counsel in violation of his *Miranda* rights.") (citing *Oregon v. Hass*, 420 U.S. 714 (1975)).

Placing Mr. Carr on the stand would have thus exposed him to substantial attacks on his character and credibility. Significantly, Mr. Carr's explanation for the material differences between the interview and post-conviction testimony was not particularly appealing or persuasive, and Ms. French's testimony regarding whether the shooting was accidental at the first and second trial further contradicts the narrative that the victim's death was the result of an accidental shooting. At the post-conviction stage, Mr. Carr also conceded that he could not recall many details, that his memories might have changed since the night of the murder, and that he intentionally made material misstatements to the police. The jury may have viewed the Mr. Carr's description of his alcohol use and the disparaging statements about the victim with disfavor or may simply not have liked Mr. Carr's demeanor on the witness stand. Additionally, the prosecution may have seized on any number of Mr. Carr's potential misstatements to discredit his broader narrative or to bolster their case.

With respect to the decision not to request a voluntary manslaughter instruction, the Indiana Court of Appeals seems to recite the events at the first trial and direct appeal incorrectly, at least on this record. Specifically, at the first trial, the trial court provided a

voluntary manslaughter instruction; and, based on the court's review of the record pertaining to the first trial, it appears that the video-recorded interview formed the evidentiary basis for that instruction. Nevertheless, the state court's overarching point that no evidence at the second trial supported a voluntary manslaughter instruction remains sound. No evidence of a physical struggle or a heated argument was presented at the second trial. To the contrary, Sally Tate testified that she did not hear raised or angry voices from the victim's residence on the night of the murder.[8] Mr. Carr contends that he should have been called as a witness to support such an instruction, but his post-conviction testimony also did not support a voluntary manslaughter instruction. *See Hileman v. State*, 224 N.E.3d 321, 328 (Ind. Ct. App. 2023) ("Sudden heat is characterized as anger, rage, resentment, or terror sufficient to obscure the reason of an ordinary person, preventing deliberation and premeditation, excluding malice, and rendering a person incapable of cool reflection.").

The court also finds that the state court's conclusion that trial counsel had no reason to suspect that interviewing Ms. French would have produced new material information given her statements to the police and her testimony at the first trial was not unreasonable. Further, Ms. French's testimony that Mr. Carr had told her that the victim had told him that the gun did not work would have raised significant credibility concerns if presented at trial. Ms. French not only omitted this information from her police

---

[8] The presentation of Sally Tate's testimony was consistent with trial counsel's strategy of pursuing a reckless homicide instruction and with arguing that the prosecution had not sufficiently proven that Mr. Carr had intended to kill the victim.

interview and two trials but contradicted it by twice testifying that Mr. Carr did not convey that the shooting was an accident. Additionally, her explanation for this material omission was that she was never asked about it, but this explanation falls flat given the prosecution's substantial efforts to discern the precise contents of Mr. Carr's statements to her. Her clear recollection of this new information stood in stark contrast with her difficulties remembering Mr. Carr's other statements at the first trial, the second trial, and on post-conviction review; and the prosecution would have likely emphasized these credibility concerns in tandem with her testimony that she considered Mr. Carr to be her personal friend. Moreover, it is unclear how beneficial such testimony would have been even without Ms. French's credibility concerns given that the jury from the first trial had heard Mr. Carr's statements that the victim had told Mr. Carr that the gun did not work but still found him guilty of murder.

On this basis, the court cannot find that the state court made an unreasonable determination on the claims that trial counsel should have called Mr. Carr as a witness, interviewed Ms. French, and requested a voluntary manslaughter instruction. Therefore, these claims are not a basis for habeas relief.

## CERTIFICATE OF APPEALABILITY

Pursuant to Section 2254 Habeas Corpus Rule 11, the court must grant or deny a certificate of appealability. To obtain a certificate of appealability under 28 U.S.C. § 2253(c), the petitioner must make a substantial showing of the denial of a constitutional right by establishing "that a reasonable jurist could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues

presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). For the reasons explained in this order, there is no basis for encouraging Mr. Carr to proceed further.

For these reasons, the court GRANTS the motion for leave to file an oversized traverse (ECF 42); DENIES the habeas corpus petition (ECF 1); DENIES a certificate of appealability pursuant to Section 2254 Habeas Corpus Rule 11; and DIRECTS the clerk to enter judgment in favor of the Respondent and against the Petitioner.

SO ORDERED.

September 16, 2024                          *s/ Damon R. Leichty*
                                            Judge, United States District Court